IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID GATHINGS,

    Petitioner,                      Case No. 2:04-cv-2210 MCE KJN P

    vs.

GEORGE J. GIURBINO, Warden,

    Respondent.                 FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding without counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2001 conviction on charges of voluntary manslaughter, with an enhancement for use of a firearm. Petitioner was ultimately sentenced to the six year middle term, plus a consecutive ten-year upper term for the firearm enhancement.[1] Petitioner raises one claim in his amended petition, filed July 29, 2005, that his prison sentence violates the Constitution.

---

[1] In a previous appeal, petitioner challenged the 10-year upper term for the firearm use enhancement, on the ground that the court misapplied the aggravating factor that the firearm use was premeditated. (Resp't's Lodged Documents ("LD") 4 at 2.) The appellate court found trial counsel ineffective and vacated the 10-year upper term for the enhancement and remanded the matter for re-sentencing. (Id.) On remand, the trial court imposed a 10-year upper term enhancement based on the finding that petitioner discharged his firearm "intentionally multiple times." (Id.)

FACTS[2]

On the evening of May 31, 2000, victim Brian Bower, accompanied by his good friend John Duran and two other men, Steve (whose surname is unknown) and David Morie, drove to Ed Ruiz's rural home to look at some drugs. [Petitioner], who spent a lot of time at Ruiz's place, was there when the four men arrived. Ruiz was also present. [Petitioner] was surprised to see Morie with the other men since Morie usually came by himself. Ruiz was familiar with Morie, and [petitioner] knew Morie from other drug deals conducted in the preceding week. Neither [petitioner] nor Ruiz knew the victim, Duran, or Steve.

Morie was trying to get the victim some methamphetamine and thought [petitioner] would have some. He said the victim wanted to buy an ounce of methamphetamine. As it happened, [petitioner] had about three-quarters ounce of methamphetamine with him that night, which he had bought for $400. Morie suggested, and [petitioner] agreed, that they cut one-half ounce of the methamphetamine with an equal amount of filler provided by Morie and sell it to the victim.

[Petitioner] combined and bagged the drugs and filler. [Petitioner] then weighed the mixture in the baggie on the scale while the victim looked on. The victim then smoked a sample of the mixture and pronounced it "good." The victim paid [petitioner] $370 for the drugs. [Petitioner] then departed in his truck. A detective testified that $370 was a very low price for one ounce of methamphetamine.

Later, Duran suggested the victim had been shorted. The victim, Duran, and Steve returned to Ruiz's place one to two hours later, at about 2:00 a.m. on June 1, looking for [petitioner]. With Ruiz's help, the victim tried to page [petitioner] for about 15 minutes, without success.

Next the victim, Duran, and Steve had Ruiz go with them to point out [petitioner]'s home and then returned Ruiz to his home. At least twice between about 2:30 a.m. and 7:30 a.m. on June 1, the victim and his two friends went to [petitioner]'s home and knocked on the door. [Petitioner] was inside, but at his direction, his fiancee told the men he was not there. The men told her to have [petitioner] contact the victim. On one of their visits, the men argued with the fiancee's mother but made no threats against [petitioner]. The three men stayed up all night looking for [petitioner]. The victim and Duran then did some drugs before the

---

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Gathings, No.C037753 (January 26, 2002), a copy of which is included in the Clerk's Transcript ("CT") at 3-23.

2

victim started work at about 8:15 a.m.

Duran visited the victim at work at about noon on June 1 to see whether the problem with [petitioner] had been resolved. While there, Duran overheard the victim's phone conversation with [petitioner], wherein the two men agreed to meet at Ruiz's place after the victim got off work. The victim asked Duran to go there with him, and Duran agreed to do so because the victim did not know anyone who had been there the previous night and Duran wanted to make sure nothing bad happened to the victim.

Duran returned to the victim's workplace at 4:30 p.m. and brought along two other men: his best friend David Champion and his long-time friend Brian Davis. Neither Davis nor Champion had met the victim before, nor did they know each other. Duran asked Davis to go with him to Ruiz's place because the victim had a problem with someone and was going to meet the person there to discuss it. Duran told him the problem related to a bad drug deal and a confrontation, both of which had occurred the previous night. The victim was dissatisfied with the quality and the quantity of the drugs he had purchased. Duran wanted to be there because things might get out of hand. Davis was there to protect Duran.

Duran and his two friends departed for the Ruiz residence in Duran's truck. The victim went in his own truck and along the way picked up Chris Ortega and Steve. Then all six men went to Ruiz's place, arriving at about the same time. There were many other people, mostly men, in Ruiz's front yard when the six men arrived. Ruiz was present. Duran and the victim parked their trucks near the house and garage, where at least one other vehicle was located.

About an hour earlier, Jennifer Ornellas, the victim's friend, had arrived at Ruiz's place with Toby Pitts and Pitts's friend David, who went by the nickname "Capone." Ornellas testified that going to Ruiz's house was Pitts's idea even though Pitts did not know anyone there. Pitts had been a good friend of the victim for a long time. Ornellas knew some of the men who arrived with the victim. In sum, there were at least 12 to 15 people present, including a number inside the crowded house. Duran later told a detective there were 20 to 25 people there.

After the victim and Champion exchanged small talk with Ornellas in the front yard for a few minutes, the victim and the five men with him filed into the garage. Ortega and Steve brought methamphetamine, and they and some of the other men smoked some in the garage with a pipe. Others only drank beer. None of the men in the garage had a gun, knife, or any other weapon.

The one-car garage had one large door (for a vehicle), which remained closed, and two small front and back doors, which were

open. The inside of the garage was fairly dark; it was still daylight, and the only illumination was the natural light entering through the small doors.

After the six men were inside the garage, [petitioner] drove up. At some point the victim came out of the garage and spoke with [petitioner] in the front yard. The victim then re-entered the garage through the front door, followed by [petitioner]. The two of them went to the back of the garage and began discussing the drug deal the victim was upset about. Duran was closest to the two men, about two feet away, between them and the back door.

The victim was dissatisfied with what he bought the night before and he wanted [petitioner] to make good on it. At first the victim was not angry or yelling, but soon the volume of the men's voices increased. The victim had the baggie of methamphetamine he bought the night before and tried to give it to [petitioner], who at first refused to take it, angering the victim. The victim claimed the drugs were "no good" and said he wanted his money back. Eventually [petitioner] accepted the baggie and asked for a pipe so he could test the quality of the methamphetamine; the victim then called out for a pipe. None was provided. The baggie was passed back and forth several times.

Duran interjected that there was no "need to check it out, it was garbage." From that point on, Duran played a part in what became a three-way discussion. Duran said that [petitioner] "needed to make it right," to which [petitioner] responded that he had neither money nor drugs to give to the victim.

As he had discussed previously with the victim, Duran next suggested that [petitioner] could compensate the victim by giving him the "pink slip" to [petitioner's] truck. [Petitioner] responded negatively, asking Duran, "'And who is going to make me?'" Duran believed [petitioner] had addressed him as if he believed Duran was going to become involved in the dispute "in some form of physical manner." Duran then said, "He will," indicating the victim. The conversation became more heated, and the victim's body language and words indicated he was becoming more upset and angry. The victim and [petitioner] were roughly the same height, but the 236-pound victim outweighed [petitioner] by at least 40 pounds (petitioner claimed he weighed 150 pounds at the time).

[Petitioner] told the victim, "'tough shit, I'm leaving,'" and started to move toward the door, but the victim put his hands on [petitioner's] chest and pushed him to stop him from leaving. The victim said, "'Well, wait a minute, what are we going to do about this?'" [Petitioner] backed up a step but the victim kept coming toward him. [Petitioner] told the victim, "'Well, I guess you're just fucked.'"

4

The victim said "'bullshit,'" and when [petitioner] turned and tried to leave a second time, the victim again stopped him. This time the victim grabbed [petitioner's] upper body and pushed him backwards. The second push was harder than the first and made [petitioner] stagger. The victim was forcing [petitioner] back into a corner near a bench next to a wall. [Petitioner] reached back and grabbed the bench to catch his fall and to keep himself from being pushed over or falling onto the bench. No one intervened or verbally threatened [petitioner]. By this time, both men were yelling at each other.

While the victim was pushing [petitioner] the second time, and while [petitioner's] back was arched backward over the bench, [petitioner[ used his right hand to pull a .25-caliber pistol from his waistband. The victim immediately grabbed [petitioner's] gun hand wrist with his left hand and gripped [petitioner's] throat with his right hand. The first shot went off right after [petitioner] pulled out the gun, while it was still pointed directly at the ground, and missed the victim.

While the victim and [petitioner] struggled, [petitioner] raised the gun in a sweeping motion toward the victim. A second shot was fired while the gun muzzle was nearly touching the victim's right arm, which broke the victim's upper arm bone in two.

Next, the victim lowered his head and lunged into [petitioner], forcing [petitioner] back onto the bench. The larger victim pushed with his whole body against the smaller [petitioner]. As [petitioner] was losing his balance, the victim thrust up [petitioner's] right hand and tried to push him over. As [petitioner's] arm was pushed up, he twisted his wrist so that the gun was pointed straight down at the victim's head. The third shot was fired with the gun muzzle pressed against the victim's scalp. The bullet traveled straight down into the victim's head and killed him instantly.

The victim dropped to the floor. All three shots were fired within about 10 seconds. [Petitioner] was in the garage for about 10 minutes before shots were fired.

[Petitioner] picked up the methamphetamine baggie from the floor, pointed the gun at Duran, Champion, and Davis, and then left the garage. Other men then ran out of the garage, screaming and tripping over each other. Someone said that the victim was dead.

[Petitioner] ran to his truck, which was parked across the street. He was by Pitts, who had heard the gun shots. Pitts did not want [petitioner] to leave until he found out what was going on and whether [petitioner] was at fault. [Petitioner] beat Pitts to the truck and got inside, but he and Pitts struggled through the open window

>  for about 45 seconds. Pitts was trying to choke [petitioner] and take away his gun.
>
>  [Petitioner] then sped away. He later ditched his truck in an irrigation canal, took off his shirt to keep from being recognized, and hitchhiked to his grandfather's home in Kern County. Later in June [petitioner] was found hiding in his grandfather's closet and was arrested.

(People v. Gathings, slip op. at 6-22.)

## PROCEDURAL HISTORY

Petitioner appealed to the California Court of Appeal, Third Appellate District. The Third District Court of Appeal affirmed petitioner's conviction and sentence on July 22, 2003. (Resp't's Lodged Document ("LD") 4.) Petitioner filed a petition for review in the California Supreme Court. (LD 5.) The California Supreme Court denied the petition on October 15, 2003. (LD 6.) Petitioner did not seek habeas relief in the state courts.

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citation omitted) A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be used to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

>  An application for a writ of habeas corpus on behalf of a person

> in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citation omitted).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."); accord Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle, 313 F.3d at 1167.

II.  Abuse of Discretion - Enhancement

Petitioner claims that the trial court abused its discretion by imposing the upper-term enhancement. (Dkt. No. 10 at 4.) Petitioner argues that a sentencing departure above the middle term must be supported by proper factors in aggravation rather than arbitrary or irrational reasons. (Id.) Petitioner contends the trial court's statements expressly rejecting the jury's verdict suggest improper factors in reaching the aggravating term. (Id.)

Respondent counters that petitioner's claim fails because it is a state law sentencing claim. (Dkt. No. 13 at 9.) Respondent points out that petitioner failed to allege the sentence violated the Constitution or to provide any supporting factual or legal discussion supporting such a federal claim. (Dkt. No. 13 at 11.) In any event, petitioner failed to raise any federal claim regarding sentencing in the state courts, so any such claim is unexhausted. (Id.)

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court rejected this claim as follows:

> In this appeal, [petitioner] contends the trial court abused its discretion in imposing the upper term for the firearm use enhancement. According to [petitioner], in light of the jury's verdict, it was improper for the trial court to find [petitioner] intentionally fired his weapon. [Petitioner] also claims the court

erred in allegedly relying on his use of a firearm in the drug business to impose the aggravated term. [Petitioner] argues the single aggravating factor cited by the court is insufficient by itself to justify imposition of the upper term. Finally, in his reply brief, [petitioner] urges this court to reject the suggestion by the People that even if the trial court erred, any error was harmless in light of the existence in the record of other aggravating factors not relied on by the court.

As [petitioner] acknowledges, a single factor in aggravation is sufficient to justify imposition of the upper term. [Citation omitted.] Moreover, the sentencing court has broad discretion in weighing aggravating and mitigating circumstances, and that court may balance them in qualitative and quantitative terms. [Citations omitted.] Absent a clear showing the court's sentencing choice was irrational or arbitrary, the appellate court must affirm that choice. [Citation omitted.]

In this case, doubtless as a consequence of the remand, the trial court was careful to explain the precise basis for its conclusion that the aggravated term for the enhancement was the appropriate sentence for [petitioner]. By its statements, the court also took pains to make clear what it was *not* relying on. In the court's words, "I think [petitioner] did well by the jury. I'll say that at least it seemed to me that that was at least second degree murder, at least. But I'm not – I don't want to use that circumstance because or rely upon [sic] that I don't want to really feel the Court's misunderstanding me because I failed to articulate some circumstance. I know another circumstance which I could use but will not is the fact that he carried a gun in his drug business. This was how he did business."

The trial court also recognized and assessed mitigating circumstances relating to [petitioner]. For example, at one point the court commented as follows: ". . . [Y]ou know on [sic] [petitioner's] good behavior in a prison and his efforts to rehabilitate himself may justify that decision about the poor judgment of youth, which will be cured by the wisdom of age. [¶] But finally to view the choices I have to make about mitigation and aggregation [sic] very, very narrowly the Court doesn't say that I must do this, but they do suggest it a bit when he talks about a manner in which the gun is used. If we look at it that way, I did hear the case and I made two observation [sic] the first is that the medical expert that testified indicated that after the arm was shot there would be very little strength in [the victim's] hand. [¶] That being the case, [petitioner] would have been in a position to understand that he had weakened his intent. [Sic.] Second, while it is an open question about whether the first shot was intentional or not, it may well have been accidental. I really think there is insufficient evidence upon which to make a judgment in that regard. [¶] I am satisfied that the second and third shots were

intentional. And so viewing it very narrowly, the Court find [sic] that the gun was fired intentionally multiple times and for that reason selects the aggravated term of ten years for the enhancement."

Finally, the trial court articulated the linchpin of its analysis: " . . . I'm going to focus and choose to focus very clearly on how the gun was used."

On the record before it, we conclude the trial court's decision to impose the aggravated term for the firearm use enhancement was well within its discretion. As we have suggested, and contrary to [petitioner's] claim, the record reflects the court's determination not to be influenced by circumstances such as its belief [petitioner] carried a firearm because he was in the drug business, or that he merited conviction for murder rather than manslaughter. Moreover, we discern no misapplication by the court of the criteria relating to imposition of the aggravated term.

[Petitioner] argues the trial court's finding of an intentional shooting is inconsistent with the jury's verdict. [Petitioner] errs. Although voluntary manslaughter does not require an intent to kill (citation omitted), it does require the doing of an intentional act. Moreover, the personal use of a firearm requires a showing the [petitioner] intentionally displayed or fired it. (Citation omitted.) Here, although it rejected a verdict of second degree murder and its accompanying firearm discharge enhancement, the jury found [petitioner] personally used a firearm. Accordingly, cases cited by [petitioner] such as *People v. Spencer* (1996) 51 Cal.App.4th 1208, which considered the use of various factors by the trial court that were inconsistent with the findings by the jury, are inapposite.

[Petitioner] acknowledges that the firing of multiple shots "arguably is a proper aggravating factor. Indeed it is. (Cal. Rules of Court, rule 4.421(a)(1).) Firing multiple times, especially when the victim already is wounded, is a cruel and vicious act within the meaning of the rule. But [petitioner] also asserts the court failed to assign that factor sufficient qualitative weight so that it was shown to be greater than the mitigating circumstances present in the case.

The record belies [petitioner's] assertion. It shows the trial court recognized [petitioner's] mitigating factors but found that the extreme manner of the use of the firearm under the circumstances faced by [petitioner] outweighed the circumstances in mitigation, justifying the aggravated term. Such a finding was well within the broad exercise of the court's discretion.

We find no abuse of discretion in the sentencing determination made by the trial court. Our review of both the record and of the comments made by the court persuades us that the decision to impose the upper term was not an arbitrary or irrational one.

> (Citation omitted.) In light of our disposition, we need not consider the assertion by the People that any error was harmless due to the presence of other valid aggravating factors not considered by the trial court.

(LD at 2-6.)

Petitioner's claims of sentencing error are not cognizable in this federal habeas corpus proceeding. Habeas corpus relief is unavailable for alleged errors in the interpretation or application of state sentencing laws by either a state trial court or a state appellate court. Hendricks v. Zenon, 993 F.2d 664, 674 (9th Cir. 1993). So long as a state sentence "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976). The Ninth Circuit has specifically refused to consider state law errors in the application of state sentencing law. See, e.g., Miller v. Vasquez, 868 F.2d 1116 (9th Cir. 1989). In Miller, the court refused to examine the state court's determination that a defendant's prior conviction was for a "serious felony" within the meaning of the state statutes governing sentence enhancements. Id. at 1118-19. The court did not reach the merits of the Miller petitioner's claim, stating that federal habeas relief is not available for alleged errors in interpreting and applying state law. Id. (quoting Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985)).

In Estelle v. McGuire, 502 U.S. 62 (1991), the Supreme Court reiterated the standard of review for a federal habeas court. It held that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Id. at 65. The Court emphasized that "federal habeas corpus relief does not lie for error in state law." Id. (citing Lewis v. Jeffers, 497 U.S. 764 (1990), and Pulley v. Harris, 465 U.S. 37, 41 (1984)). The court further noted that the standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Estelle, 502 U.S. at 67. Because petitioner has not shown that his sentence was

fundamentally unfair, this claim is not cognizable on federal review.  See Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994).

Petitioner's claim of sentencing error does not state a federal claim.  Accordingly, this claim should be denied.[3]

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 6, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

gath2210.157

---

[3] Petitioner cited Apprendi v. New Jersey, 530 U.S. 466 (2000) in his petition for review to the California Supreme Court.  (LD 5 at 17-18.)  However, "[a]s a policy matter, on petition for review the Supreme Court normally will not consider an issue that the petitioner failed to timely raise in the Court of Appeal."  Cal. Rules of Court, rule 28(c)(1).  Petitioner did not raise a federal claim in the state appellate court.  See LD 1 and 3.  Moreover, even assuming that petitioner intended to raise a federal claim, he has failed to demonstrate that the trial court's calculation of the enhancement violated the Eighth Amendment.  "It is well-settled that [c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).  Petitioner provided no argument or citation to case law or the record in support of any federal claim.  Without more, a suggestion of a federal claim is conclusory and does not meet the specificity requirement.